1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11   JAMES MCCURDY,                         Case No. 17-01043 BLF (PR)

Plaintiff,                      **ORDER GRANTING MOTION FOR**
12                                          **SUMMARY JUDGMENT**

13   v.

14   M. RIVERO, et al.,

15                Defendants.

16                                          (Docket No. 118)

17

18        Plaintiff, a California inmate, filed the instant *pro se* civil rights action pursuant to

19   42 U.S.C. § 1983 against prison officials at various institutions.  The Court found the

20   amended complaint, (Docket No. 11, hereinafter "Am. Compl."), stated cognizable claims

21   under the Eighth Amendment and ordered Defendants to file a motion for summary

22   judgment or other dispositive motion.[1]  (Docket No. 13.)

23   _____

24   [1] The Court granted in part a motion for summary judgment based on failure to exhaust
     administrative remedies filed by San Quentin State Prison ("SQSP") Defendants Alvarez,
25   Deal, Devers, Leighton, Pratt, Tootell, and Wu, along with Pelican Bay State Prison
     ("PBSP") Defendants Jacobsen, McLean, and Thomas, and joined in by Defendants Lee
26   and Rivero.  (Docket No. 104 at 15, 18, 29.)  The Court found the only exhausted claims
     were the following: (1) claim against Defendant Deal at SQSP for discontinuing his
27   tramadol medication; and (2) claim against Defendant Thomas at PBSP for improperly
     discontinuing his pain, cramping, diarrhea, and indigestion medications.  (*Id*.)  The Court
28   also granted Defendants' motion to dismiss for improper joinder of claims and parties and
     directed Plaintiff to file notice which of the two exhausted claims he wished to pursue.

Defendant Dr. B. Deal filed a motion for summary judgment on the grounds that he did not discontinue Plaintiff's prescription for tramadol, there are no genuine disputes on any material fact with respect to the medical treatment that Plaintiff received, and Defendant is entitled to qualified immunity. (Docket No. 118, hereinafter "Mot."[2]) Plaintiff filed an opposition along with exhibits in support thereof, (Docket No. 136, Exs. A-E), as well as a sworn declaration, (Docket No. 141, Ex. A[3]). Defendant filed a reply. (Docket No. 139.)

For the reasons stated below, Defendant's motion for summary judgment is **GRANTED**.

## DISCUSSION

### I.     <u>Statement of Facts</u>[4]

Plaintiff arrived at SQSP on June 24, 2014, and remained there until he was transferred to another prison on January 22, 2015. (Tootell Decl. ¶ 6; Am. Compl. at 26.) From October 30, 2014 to December 4, 2014, Plaintiff was temporarily transferred to Napa

---

(*Id*.) Plaintiff filed notice that he wished to proceed with the claim against Defendant Deal for discontinuing his tramadol medication and have the claim against Defendant Thomas severed and opened as a separate action. (Docket No. 106.) Accordingly, the Court ordered briefing to proceed on the claim against Defendant Deal in this action. (Docket No. 107.) The claim against Defendant Thomas was severed and opened as a separate action. (*Id*.)

[2] In support of his motion, Defendant provides the declarations of the following: E. Tootell, who was the Chief Medical Executive at SQSP during the relevant period, along with exhibits containing authenticated copies of documents from Plaintiff's medical records, (Docket Nos. 118-1, 118-2); Defendant B. Deal along with exhibits containing authenticated copies of documents from Plaintiff's medical records, (Docket Nos. 118-3, 118-4); and counsel Zewugeberhan Desta along with an exhibit containing an authenticated copy of Plaintiff's "Offender Appointments" record, (Docket Nos. 118-5, 118-6).

[3] The Court denied Plaintiff an opportunity to file a sur-reply under Local Rule 7-3(d) but permitted him to file a properly sworn declaration in support of his opposition. (*See* Docket Nos. 143, 144.)

[4] The following facts are not disputed unless otherwise stated.

County Jail to attend a criminal court proceeding. (Am. Compl. at 24.) Accordingly, Plaintiff was housed at SQSP for less than six months during which time he received treatment for his medical and mental health needs as summarized below.

### A. Medical Care

Before his transfer to SQSP on June 24, 2014, Plaintiff had a prescription for Ultram (tramadol) 50 mg from a county jail, where he was previously incarcerated, to treat his chronic abdominal pain. (Tootell Decl. ¶¶ 6, 8, Ex. A at MCCURDY-MSJ 0151-02.) Tramadol, which is a generic name for Ultram, is a centrally acting synthetic opioid analgesic, which has narcotic effects and has been classified as having addiction potential. (*Id.* ¶ 7.) Tramadol is a "non-formulary," category IV controlled substance, per the California Correctional Health Care Services ("CCHCS") Formulary guidelines. (*Id.*) CDCR medical providers are encouraged to use the drugs listed in the CCHCS formulary, and the pharmacy must dispense generic equivalents when available. (*Id.*) If there is not a suitable agent on the formulary medication list for an inmate, a medical provider may provide a drug that is non-formulary on a patient-specific basis, but only after submitting a request and receiving approval from the Facility Medical Authority ("FMA"). (*Id.*)

Upon his arrival at SQSP on June 24, 2014, Plaintiff was seen and evaluated by a registered nurse. (*Id.* ¶ 8, Ex. A at MCCURDY-MSJ 0100-03.) The nurse completed McCurdy's initial health screening and documented it in a CDCR 7277 form. (*Id.*) The nurse noted on the form that Plaintiff had a history of on-and-off abdominal pain and had prescriptions for Neurontin (gabapentin) and Ultram/tramadol from a previous provider. (*Id.*) Plaintiff's medical records also show that Dr. Rivero requested authorization to continue the tramadol 50 mg for two weeks until Plaintiff could be evaluated by a provider, by completing a Non-Formulary Drug Request form, CDCR 7374. (*Id.*) Dr. Rivero's request for tramadol was approved the next day by a SQSP medical authority. (*Id.*)

Two days later, on June 26, 2014, Plaintiff was seen and evaluated by Dr. Lee as

3

part of his intake process at SQSP. (*Id.* ¶ 9, Ex. A at MCCURDY-MSJ 0104-07.)  During the visit, Plaintiff told Dr. Lee that he was on tramadol for abdominal pain. (*Id.*)  Plaintiff further stated that he had the abdominal pain near his bellybutton for about two years. (*Id.*)  Plaintiff described the pain as "squeezing that comes and goes," but not radiating. (*Id.*)  Plaintiff also stated that he had one bowel movement a day, and that he exercised by doing 500 push-ups daily since incarcerated in January 2014. (*Id.*)  Plaintiff denied having any fever, weight loss, anorexia, nausea, vomiting, constipation, diarrhea, change in stools, or urinary symptoms. (*Id.*)  Dr. Lee's physical examination notes state that Plaintiff's abdomen appeared normal. (*Id.*)  Dr. Lee's assessment also showed that Plaintiff had a history of hepatitis C and opiate use. (*Id.*)  Dr. Lee's treatment plan was to: (1) order laboratory tests; (2) maintain Plaintiff's prescription for tramadol until July 9, 2014; (3) decrease the dosage to 50 mg per day for two weeks after July 9; (4) take Plaintiff off the medication two weeks after July 9; (5) order hepatitis C antibody test; (6) get more information regarding Plaintiff's family medical history; (7) examine the temporal arteries, and test his blood's ferritin level; (8) provide Plaintiff a chrono for contact lenses and solution for immediate use; (9) refer him to optometry for glasses; (10) request Plaintiff's medical records from previous providers; and (11) refer Plaintiff to mental health services for his mental health needs. (*Id.*)  Plaintiff was also scheduled for a follow-up within 30 to 35 days. (*Id.*)

On June 30, 2014, Plaintiff refused laboratory tests that were ordered by Dr. Lee. (*Id.* ¶ 10, Ex. A at MCCURDY-MSJ 0108-09.)  According to Plaintiff, he did not show up for the lab tests because he was under the impression that the labs were merely for hepatitis C bloodwork, and he had to "pick and choose" days to use his ducats for making appointments. (McCurdy Decl. ¶ 21.)

On July 28, 2014, Plaintiff submitted health care services request for abdominal pain, and was seen by a registered nurse. (Tootell Decl. ¶ 11, Ex. A at MCCURDY-MSJ 0110.)  The nurse noted Plaintiff's request for tramadol to treat his pain. (*Id.*)  The nurse

4

noted Plaintiff's vital signs and that his pain level was a three on a scale of one to ten. (*Id.*) Plaintiff denied that he had diarrhea. (*Id.*) Plaintiff was then scheduled to be seen by a physician for his pain complaint. (*Id.*)

On August 1, 2014, Plaintiff was seen, evaluated, and treated by Dr. Devers for his chronic abdominal pain complaint. (*Id.* ¶ 12, Ex. A at MCCURDY-MSJ 0111-12.) Dr. Devers noted that Plaintiff had chronic abdominal pain, hepatitis C, history of left inguinal and umbilical hernia, and family history of hemochromatosis. (*Id.*) Dr. Devers also noted that Plaintiff was frustrated because he was tapered off tramadol and gabapentin medications. (*Id.*) Dr. Devers further noted that Plaintiff's medical records showed that he had a history of polysubstance abuse. (*Id.*) Plaintiff denied having nausea, vomiting, constipation, or diarrhea. (*Id.*) Plaintiff told Dr. Devers that tramadol did not help him much, but a combination of tramadol and gabapentin did improve his pain. (*Id.*) When Dr. Devers suggested a trial of Elavil, Plaintiff declined that medication. (*Id.*) According to Plaintiff, he refused Elavil because he had serious side effects to the anti-depressant medication in the past. (McCurdy Decl. ¶ 21.) Dr. Devers also offered Plaintiff Tylenol and non-steroidal anti-inflammatory medications, but he again declined those medications. (Tootell Decl. ¶ 12, Ex. A at MCCURDY-MSJ 0111-12.) Dr. Devers explained to Plaintiff that his pain syndrome did not justify narcotic medications at that time. (*Id.*) Dr. Devers encouraged Plaintiff to go to the Triage and Treatment Area ("TTA") when he has an episode of acute pain. (*Id.*) Dr. Devers's treatment plan for Plaintiff's hepatitis C was to order follow-up lab tests including genotype and viral load. (*Id.*) Plaintiff was scheduled for a follow-up visit in three to four weeks with laboratory results. (*Id.*)

On August 2, 2014, Plaintiff walked into SQSP's TTA for abdominal pain complaint. (Tootell Decl. ¶ 13, Ex. A at MCCURDY-MSJ 0113-14.) Plaintiff reported that he had abdominal pain for two years. (*Id.*) A registered nurse documented Plaintiff's vital signs, and noted that Plaintiff denied having any nausea, vomiting, or trauma. (*Id.*) The nurse also noted that Plaintiff had no acute distress. (*Id.*) Plaintiff informed the nurse

that he was on gabapentin and tramadol for pain.  (*Id.*)  Plaintiff was scheduled for a

follow-up primary care provider visit for his pain complaints within three to five days.

(*Id.*)  Plaintiff was advised to return to the TTA if his condition became worse, and after

drinking ample water, was returned to his cell in stable condition.  (*Id.*)

On August 12, 2014, Plaintiff was seen again by Dr. Devers for abdominal pain

complaints.  (*Id.* ¶ 14, Ex. A at MCCURDY-MSJ 0115-25.)  Dr. Devers noted that

Plaintiff had chronic abdominal pain for two years, etiology unclear; hepatitis C; history of

left inguinal and umbilical hernia repair in 2000; and family history of hemochromatosis.

(*Id.*)  Plaintiff complained to Dr. Devers that he was prescribed tramadol and gabapentin in

the past but now he had nothing.  (*Id.*)  Dr. Devers, however, noted that Plaintiff had

declined ibuprofen, Tylenol, and Elavil for his abdominal pain management at the last

visit.  (*Id.*)  After assessing and evaluating Plaintiff, Dr. Devers noted that Plaintiff was not

in acute distress, and that his past ultrasound and current laboratory tests for

comprehensive metabolic panel, CBC, and "coags" were all normal.  (*Id.*)  Dr. Devers's

plan was to treat Plaintiff's chronic abdominal pain with ibuprofen and Tylenol on an as-

needed basis, getting Plaintiff's full medical record from his previous providers, and

performing a CT scan to look for etiologies.  (*Id.*)  Dr. Devers also discussed at length with

Plaintiff how he should use the pain medications in light of his hepatitis C condition.  (*Id.*)

Regarding Plaintiff's hepatitis C, Dr. Devers noted that Plaintiff's laboratory studies were

reassuring.  (*Id.*)  Dr. Devers discussed the laboratory results with Plaintiff, who stated that

he would wait until he mainlines to pursue treatment for hepatitis C.  (*Id.*)  Dr. Devers also

noted that she offered Plaintiff a visit with a provider at SQSP, but Plaintiff stated that he

would like to wait.  (*Id.*)  Plaintiff was to have a follow-up in 30 days.  (*Id.*)

On September 2, 2014, Plaintiff was seen by a registered nurse for pain complaints

in response to a health care services request form dated August 31, 2014.  (*Id.* ¶ 15, Ex. A

at MCCURDY-MSJ -0126.)  The nurse documented Plaintiff's vital signs and noted that

his pain level was a four on a scale of one to ten.  (*Id.*)  Plaintiff asked for tramadol to

6

manage his pain complaints. (*Id.*) The nurse noted that Plaintiff's then current medications included Tylenol and Motrin. (*Id.*) The nurse also noted that Plaintiff was seen by a physician on August 12, 2014, and that the doctor had explained to him why tramadol was not indicated for his condition. (*Id.*) The nurse advised Plaintiff to take his prescribed pain medications Motrin and Tylenol. (*Id.*) The nurse also noted that Plaintiff was to be seen by a physician for further evaluation as scheduled. (*Id.*)

On September 24, 2014, Plaintiff was seen by Dr. Leighton for a follow-up from his August 12, 2014 treatment regarding his chronic abdominal pain and hepatitis C complaints. (*Id.* ¶ 16, Ex. A at MCCURDY-MSJ 0127-33.) Plaintiff reported to Dr. Leighton that tramadol and some other narcotic were effective in treating his pain. (*Id.*) He also reported that he gets abdominal pain several times a day. (*Id.*) Plaintiff's then current medications included Acetaminophen 325 mg, Ibuprofen 600 mg, and artificial tears. (*Id.*) After assessing and evaluating Plaintiff, Dr. Leighton noted that Plaintiff was a well-nourished 29-year-old man in no acute distress. (*Id.*) Dr. Leighton noted that Plaintiff did not appear to be in any severe pain, and his abdomen was completely normal. (*Id.*) Dr. Leighton also noted that Plaintiff's then recent laboratory test showed that he was immune to hepatitis A and B, completely normal metabolic panel, normal amylase and lipase, normal PT and INR, normal CBC, and normal urinalysis. (*Id.*) Dr. Leighton's plan was to treat Plaintiff's chronic abdominal pain with amitriptyline 25 mg every evening, and to follow-up in four to six weeks. (*Id.*) Plaintiff initially did not want to take any medication other than tramadol, but Dr. Leighton convinced him to start with amitriptyline 25 mg every evening because he had a documented allergic reaction to tramadol, which caused him nausea and vomiting. (*Id.*) Regarding Plaintiff's hepatitis C, Dr. Leighton noted that Plaintiff did not appear to have any sequelae, and the disease did not appear to be active. (*Id.*) Thus, the plan was to recheck laboratories in a year. (*Id.*) A follow-up appointment was scheduled for Plaintiff's abdominal pain complaints. (*Id.*)

On October 4, 2014, a nurse issued a medication management referral to Plaintiff

because for three consecutive days, he did not show up for his nurse-administered amitriptyline 25 mg that was prescribed for him to treat his chronic abdominal pain. (*Id.* ¶ 17, Ex. A at MCCURDY-MSJ 0134-35.) On October 6, 2014, Dr. Leighton stopped the order for amitriptyline because Plaintiff refused to take it. (*Id.*)

From October 30, 2014 to December 4, 2014, Plaintiff was transferred out of SQSP to Napa County Jail. (Am. Compl. at 24; Tootell Decl. ¶ 18.) Upon his return to SQSP on December 4, 2014, Dr. Wu prescribed Plaintiff acetaminophen 650 mg for one month to treat Plaintiff's abdominal pain complaints, and scheduled Plaintiff for a primary care provider follow-up within two weeks. (Tootell Decl. ¶ 18, Ex. A at MCCURDY-MSJ 0136.)

On December 5, 2014, Plaintiff submitted a health care services request form asking to continue medication that he had at the county jail before he returned to SQSP. (*Id.* ¶ 19, Ex. A at MCCURDY-MSJ 0137-39.) Plaintiff's request was received and reviewed by a registered nurse on December 8, 2014. (*Id.*) The next day, on December 9, 2014, Plaintiff was seen by Dr. Alvarez. (*Id.*) After assessing and evaluating Plaintiff, Dr. Alvarez noted that Plaintiff had no new complaints and symptoms but continued to claim to have chronic abdominal pain. (*Id.*) Dr. Alvarez also noted that Plaintiff's then recent laboratory test showed normal results. (*Id.*) Dr. Alvarez further noted that Plaintiff had several surgeries in the past including umbilical hernia, but Plaintiff's pain syndrome did not match with what would be expected with intermittent adhesional obstructions. (*Id.*) Dr. Alvarez further noted that Plaintiff had an extensive history of substance abuse and opiate seeking behavior. (*Id.*) Dr. Alvarez's plan was to treat Plaintiff's chronic abdominal pain with Prilosec. (*Id.*) Dr. Alvarez advised Plaintiff that opiates or tramadol was not indicated for his condition. (*Id.*) Dr. Alvarez planned to order an upper endoscopy, a colonoscopy, and CT scan with contrast if Plaintiff continued to have the abdominal pain symptoms. (*Id.*) Dr. Alvarez further noted that Plaintiff had no red flags for serious or systemic disease process of the abdomen. (*Id.*) Dr. Alvarez educated Plaintiff about the inappropriateness

of opiates for the type of pain complained prior to comprehensive workup including upper and lower endoscopies and imaging as well. (*Id.*) Regarding Plaintiff's hepatitis C, Dr. Alvarez noted that Plaintiff had a low viral load of hepatitis C with no evidence of liver inflammation. (*Id.*) Dr. Alvarez stated that Plaintiff was stable at the time and might benefit from treatment at some point in the future. (*Id.*) Dr. Alvarez ordered a tetanus vaccine for Plaintiff and scheduled a follow-up appointment. (*Id.*)

On December 16, 2014, Plaintiff submitted a health care services request form asking to see a doctor for back pain. (*Id.* ¶ 21, Ex. A at MCCURDY-MSJ 0140-44.) Plaintiff's request was received and reviewed by a registered nurse on December 17, 2014. (*Id.*) The nurse documented Plaintiff's vital signs and completed a non-traumatic musculoskeletal complaint worksheet on December 18, 2014. (*Id.*) Plaintiff stated to the nurse that he hurt his back while exercising. (*Id.*) The nurse also documented that Plaintiff's then current medication included Tylenol and Prilosec 20 mg. (*Id.*) Plaintiff was scheduled for a weekly visit with a registered nurse until his condition improved. (*Id.*)

In a follow-up from his December 18, 2014 visit, Plaintiff was seen, evaluated, and treated by a registered nurse on December 26, 2014. (*Id.* ¶ 22, Ex. A at MCCURDY-MSJ 0145-47.) The nurse documented Plaintiff's vital signs and completed a non-traumatic musculoskeletal complaint worksheet. (*Id.*) Plaintiff complained that he still had lower back pain that comes and goes, from his prior injury. (*Id.*) The nurse noted that Plaintiff's then current medications included Tylenol. (*Id.*) Plaintiff stated that he had started stretching and exercising again. (*Id.*) He also informed her that tramadol was effective, and that he finished a bottle of 24 ibuprofen tables in two days and that he was done with the prescribe Tylenol quickly. (*Id.*) The nursed advised Plaintiff of the dangers of over using pain medications, especially considering his hepatitis C condition. (*Id.*) Plaintiff agreed with the nurse's plan of care and received his medications in the RN line that day. (*Id.*) The nurse instructed Plaintiff to follow-up in the RN clinic in 72 hours if symptoms persisted. (*Id.*) Plaintiff was also referred for a follow-up at the physician clinic. (*Id.*)

9

On January 8, 2015, Plaintiff was seen, evaluated, and treated again by Dr. Alvarez for a routine primary care and follow-up for his back injury and chronic abdominal pain. (*Id.* ¶ 23, Ex. A at MCCURDY-MSJ 0148-49.) Plaintiff reported that the injury was much improved, and he no longer experienced any discomfort. (*Id.*) Plaintiff also denied having any nausea, vomiting, and losing weight. (*Id.*) His laboratory results were unremarkable, and his liver function tests, complete blood count, renal panel, and urinalysis were all normal. (*Id.*) Plaintiff informed Dr. Alvarez that he stopped taking Prilosec, his prescribed chronic abdominal pain medication, because it did not help. (*Id.*) Dr. Alvarez assessed that Plaintiff had no red flags for any serious or systemic disease process relating to his chronic abdominal complaint. (*Id.*) Dr. Alvarez also opined that Plaintiff might have irritable bowel syndrome or dietary intolerances. (*Id.*) Dr. Alvarez's treatment plan was to educate Plaintiff to avoid any foods that exacerbate his condition and to discontinue Prilosec since Plaintiff was not taking it. (*Id.*)

On January 20, 2015, a registered nurse completed a CDCR 7371 health care transfer information form for Plaintiff, and he was transferred to "CMF" on January 22, 2015. (*Id.* ¶ 24, Ex. A at MCCURDY-MSJ 0150.)

### B.  <u>Mental Health Care</u>

When Plaintiff arrived at SQSP on June 24, 2014, he had a prescription for Neurontin (gabapentin) to manage his stress at the county jail and for not being able to sleep. (Deal Decl. ¶ 6, Ex. A at MCCURDY-MSJ 0001-04, 16-17.) Gabapentin is an anticonvulsant listed as a "non-formulary" medication in CDCR. (*Id.*) According to the CDC and package insert, there is no mental health indication for gabapentin's use in psychiatry. (*Id.*) Defendant Dr. Deal saw Plaintiff through a Psychiatrist on Call and determined that gabapentin was not psychiatrically indicated to Plaintiff. (*Id.*) Therefore, he ordered for a gradual, two-step taper off over a two-week period (400 mg for seven days and 200 mg for another seven days). (*Id.*)

Two days later, Plaintiff was seen, evaluated, and treated by another SQSP staff

10

psychiatrist, Dr. Milford. (*Id.* ¶ 7, Ex. A at MCCURDY-MSJ 0010-15.) Plaintiff told Dr. Milford that he was incarcerated for possession of controlled substance, resisting arrest, and armed robbery, and that he had anger issues all his life, was bipolar, and addicted to heroin. (*Id.*) Plaintiff also told Dr. Milford that he (Plaintiff) would fail if his prescription for gabapentin was stopped. (*Id.*) Dr. Milford observed that Plaintiff had substantial history of substance abuse and addiction and agreed with Dr. Deal's initial assessment to taper Plaintiff's prescription for gabapentin, referred Plaintiff for several types of tests, advised him to see physicians of medicine to address his other issues, and recommended skills training to improve his pro-social skills, anger management, and sobriety. (*Id.*) Dr. Milford also discussed with Plaintiff the reasons that his prescription for gabapentin was tapered and set for discontinuation. (*Id.*)

On July 2, 2014, Plaintiff was evaluated and assessed for his mental health needs by an Interdisciplinary Treatment Team ("IDTT"). (*Id.* ¶ 8, Ex. A at MCCURDY-MSJ 0018-22.) The IDTT identified Plaintiff's mental health problem as anxiety/depression. (*Id.*) The goal of the treatment was to stabilize Plaintiff emotionally. (*Id.*)

On July 3, 2014, a clinician visited Plaintiff at his cell because Plaintiff refused to be seen in an office setting. (*Id.* ¶ 9, Ex. A at MCCURDY-MSJ 0023.) Plaintiff stated to the clinician that his mental health was excellent. (*Id.*)

On July 7, 2014, Plaintiff was seen by a psychiatrist, Dr. Lona, for medication management follow-up related to diagnoses of adjustment disorder and polysubstance abuse. (*Id.* ¶ 10, Ex. A at MCCURDY-MSJ 0024-25.) Plaintiff told Dr. Lona that he was taking gabapentin for about three months in the context of a high stress jail and inability to sleep. (*Id.*) Plaintiff also stated that he was sleeping and eating well at SQSP, and that he did not need the gabapentin medication anymore. (*Id.*) Dr. Lona noted that Plaintiff had no major complaint. (*Id.*) Dr. Lona also noted that Plaintiff wanted to discontinue medication treatment because he had no active symptoms to treat. (*Id.*) Dr. Lona further noted that Plaintiff and she agreed to continue with gabapentin taper because Plaintiff was

11

not interested in further medication trials, and she saw no clinical indication for further

psychotropic medication trials at the time. (*Id.*) Dr. Lona, however, noted that therapy for

anger management and improvement of coping skills was indicated. (*Id.*) Dr. Lona also

educated Plaintiff on the risks and benefits of medication treatment. (*Id.*)

Plaintiff was seen for routine weekly clinician contacts on the following dates: July

9, 15, 24, and 31, 2014; August 21, and 29, 2014; and September 5, 10, and 17, 2014. (*Id.*

¶¶ 11-15, 17-20, Ex. A at MCCURDY-MSJ 0026-32, 35-39.) During each of those

weekly visits, Plaintiff reported that he was doing okay and had no problems. (*Id.*) The

clinicians also noted that Plaintiff appeared stable, alert, fully oriented, not confused,

completely coherent, and with no indications of psychopathology or acute distress. (*Id.*)

Plaintiff asked to get out of the mental health services program. (*Id.* ¶¶ 12, 13.)

On August 21, 2014, Plaintiff was seen by Dr. Ponath, a staff psychiatrist, for

medical evaluation because Plaintiff requested mental health services and reported that his

"head feels like a ripe pear." (*Id.* ¶ 16, Ex. A at MCCURDY-MSJ 0033-34.) During the

visit, Plaintiff told Dr. Ponath that he did not really need medication but wanted to speak

with another clinician and give thanks for the treatment he had been receiving. (*Id.*) Dr.

Ponath noted that Plaintiff appeared stable off medication. (*Id.*) Dr. Ponath also noted that

no medication was indicated. (*Id.*)

On September 30, 2014, Defendant Deal was covering for another staff psychiatrist,

and saw Plaintiff. (*Id.* ¶ 24, Ex. A at MCCURDY-MSJ 0041.) The purpose of the

appointment was unclear because Plaintiff was not prescribed any psychotropic medication

at the time, had not placed a referral for medication evaluation since the August 21, 2014

visit, and had not been referred by the individual therapist. (*Id.*) During the meeting,

Plaintiff informed Defendant Deal that he would be returning from administrative

segregation to the reception center for a disciplinary hearing, was grieving the denial of

prescription for tramadol, planned to try to go to fire camp, and wanted to be out of the

mental health services program. (*Id.*) Defendant Deal noted that Plaintiff was not

prescribed psychotropic medications, and that he was recommended for removal from the mental health services delivery system. (*Id.*)  Defendant Deal concluded that Plaintiff was overall psychiatrically stable for outpatient level of care, and there was no evidence of self-harm or violence. (*Id.*)  Plaintiff's mood was overall stable, and he was actively participating in treatment. (*Id.*)  Defendant Deal's assessment also showed that therapy was indicated for anger management and coping skills, but Plaintiff declined the therapy treatment at that time.  As with the prior three psychiatrists, Defendant Deal's treatment plan was to continue Plaintiff off psychotropic medications, follow-up as needed with a psychiatrist, and remove him from the mental health program per his request. (*Id.*)

## II.   Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of

evidence to support the nonmoving party's case." *Id*. at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. *See Liberty Lobby*, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id*. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. *See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id*. at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.; see, e.g., Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir. 2001).

### A. <u>Deliberate Indifference</u>

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

A "serious" medical need exists if the failure to treat a prisoner's condition could

result in further significant injury or the "unnecessary and wanton infliction of pain." *Id*. The following are examples of indications that a prisoner has a "serious" need for medical treatment: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference. *Id*. If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference, *see Toguchi v. Chung*, 391 F.3d 1051, 1058, 1059-60 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

A claim of medical malpractice or negligence is insufficient to make out a violation of the Eighth Amendment. *See Toguchi*, 391 F.3d at 1060; *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002); *Franklin*, 662 F.2d at 1344; *see, e.g.*, *Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998) (finding no merit in claims stemming from alleged delays in administering pain medication, treating broken nose and providing replacement crutch, because claims did not amount to more than negligence); *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain).

### 1. Defendant's Involvement with Tramadol Taper

Plaintiff claims that SQSP officials denied his appeals for pain medication and other accommodations, and that they would only prescribe Tylenol or ibuprofen. (Am. Compl. at 6.) It appears from Plaintiff's record of grievances that he exhausted this claim only with respect to Defendant Deal. (Docket No. 104 at 6-7.) Defendant Deal asserts that he is entitled to summary judgment because he did not discontinue Plaintiff's prescription for tramadol. (Mot. at 13.) In opposition, Plaintiff asserts that Defendant Deal was personally involved in discontinuing his prescription for tramadol. (Opp. at 2; McCurdy Decl. at 4.) In support, he submits two medication reconciliation charts showing that Defendant Deal was involved in prescribing tramadol 50 mg tablets to Plaintiff on June 24, 2014 and June 27, 2014. (Opp. at 12-13.) In reply, Defendant asserts that these records should be disregarded because they are falsified and not properly authenticated. (Reply at 1-2.) Defendant provides authenticated copies of the same record from the custodian of records at California State Prison, Corcoran, which show that the charts provided by Plaintiff are not true and correct copies. (*Id.*, Allen-Caldera Decl. ¶ 5, Docket No. 139-1; Molina Decl. ¶ 2, Docket No. 139-2.) The authenticated records show that the prescriptions for tramadol were ordered by Drs. Rivero and Lee. (*Id.*, Exs. A, B.) This fact is further supported by

SQSP's pharmacy records, which show that Drs. Rivero and Lee were the physicians who ordered Plaintiff's prescriptions for tramadol 50 mg tablets on June 24, 2014 and June 27, 2014. (Crutcher Decl. ¶ 4-5, Docket No. 139-4; *Id.*, Exs. A, B, C.) Lastly, Defendant points out that Plaintiff's previous filing with the Court includes a copy of the non-falsified actual medication reconciliation records showing that Drs. Rivero and Lee were the physicians who ordered his June 24, 2014 and June 27, 2014 prescriptions for tramadol 50 mg tablets, not Defendant Deal. (Reply at 2, citing Docket No. 11-3 at 8-9.) Plaintiff also submitted copies of other portions of his medical records, none of which, as Defendant points out, contains any relevant information on the issue of whether Defendant Deal was involved with the tapering of Plaintiff's prescription for tramadol. (Opp. at 5-10; Reply at 3.)

Although the Court is concerned about Defendant's allegation that Plaintiff has submitted falsified documents, that is not an issue the Court can resolve under Rule 56. However, the Court agrees with Defendant that Plaintiff's version of the medical reconciliation records is not authenticated and thus not admissible. Based on Dr. Deal and the custodian of records' declarations, it appears that Plaintiff would not be able to authenticate his proffered documents. Accordingly, the exhibits submitted with Plaintiff's opposition at ECF 136-12 and 13 are inadmissible as lacking proper authentication under Rule 901(a) of the Federal Rules of Evidence and will therefore not be considered in ruling on Defendant Deal's summary judgment motion. Fed. R. Civ. P. 56(e).

The evidence presented does not show a genuine dispute as to any material fact relating to Plaintiff's claim of deliberate indifference against Defendant Deal for allegedly discontinuing his tramadol prescription. Plaintiff's medical records show that during the less than six-months period that Plaintiff spent at SQSP, he received regular medical treatment for his chronic abdominal pain and monitoring of his hepatitis C. *See supra* at 3-10. Each time Plaintiff complained of abdominal pain, he was seen and evaluated by a medical official. *Id.* After he was tapered off tramadol for valid medical concerns,

including its addictive potential and Plaintiff's documented allergic reaction, Plaintiff was prescribed alternative pain medications. *Id.* Furthermore, there is no evidence that Defendant Deal was at all involved in the decision to discontinue Plaintiff's prescription for tramadol. Rather, Defendant states in his declaration that he was never involved in either prescribing or discontinuing Plaintiff's prescription for tramadol. (Deal Decl. ¶ 4.) Although Plaintiff asserts that Defendant Deal was a psychiatrist and therefore personally involved in the treatment of both medical and mental health issues, (McCurdy Decl. ¶ 8), Plaintiff fails to show support for this in his medical records. Rather, Defendant Deal had only two medical encounters with Plaintiff at SQSP, and both were regarding his mental health treatment, not his pain complaints. *See supra* at 10, 12. Defendant Deal cannot be liable for any alleged violation of Plaintiff's Eighth Amendment rights due to the discontinuation of his tramadol medication where Defendant neither actually nor proximately caused the deprivation of that right. *See Lemire v. Cal. Dept. of Corrections & Rehabilitation*, 726 F.3d 1062, 1085 (9th Cir. 2013); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1998). Plaintiff has failed to meet his burden of identifying with reasonable particularity the evidence that precludes summary judgment. *See Keenan*, 91 F.3d at 1279. Accordingly, Defendant is entitled to summary judgment on this claim. *Id.*; *see Celotex Corp.*, 477 U.S. at 323-24.

### 2. **Pain Management**

Plaintiff claims that when he arrived at SQSP, the doctors discontinued all his medications, and that he was in "severe pain." (Am. Compl. at 6.) Defendant asserts that Plaintiff received medically adequate treatment and that he was not deliberately indifferent as a matter of law. (Mot. at 14, 17.) Plaintiff asserts in opposition that after he was tapered off tramadol, he was prescribed "nothing else" and suffered great pain. (McCurdy Decl. ¶ 15.) Plaintiff claims that medical personnel changed his medication without considering his previous medical records and that they discriminated against him for having a drug history. (*Id.* ¶ 16.) In reply, Defendant asserts that Plaintiff fails to identify

18

1    a single specific instance that he was denied treatment for his pain complaint, and that

2    Plaintiff concedes in opposition that he received treatment every time he complained of

3    "severe pain."  (Reply at 4.)

4         Even crediting Plaintiff's version of the medical reconciliation records that purport

5    to show that Defendant Deal was involved in the decision to taper Plaintiff off tramadol,

6    Plaintiff has failed to submit any evidence to support his claim that the decision amounts to

7    deliberate indifference to a serious medical need.  Plaintiff's claim is essentially that SQSP

8    medical staff wrongfully tapered him off tramadol even though he had been treated with it

9    successfully at previous institutions.  In other words, Plaintiff is challenging SQSP medical

10   staff's chosen course of treatment – to taper him off tramadol and replace his pain

11   management with formulary medication like ibuprofen and Tylenol – versus the alternative

12   course of treatment, *i.e.*, to continue the tramadol prescription.  However, in order to

13   prevail on a claim involving choices between alternative courses of treatment, Plaintiff

14   must show that the course of treatment the SQSP medical staff chose was medically

15   unacceptable under the circumstances and that they chose this course in conscious

16   disregard of an excessive risk to Plaintiff's health.  *Toguchi*, 391 F.3d at 1058.

17        The undisputed facts show that SQSP medical staff did not choose a course of

18   treatment in conscious disregard of an excessive risk to Plaintiff's health.  Plaintiff was

19   seen and treated by SQSP medical staff for pain management at least 16 times, including

20   the following: June 24 (upon arrival for abdominal pain), June 25 (chronic abdominal

21   pain), June 28 (abdominal pain), August 1 (chronic abdominal pain), August 2 (abdominal

22   pain), August 12 (chronic abdominal pain), September 24 (follow-up re chronic abdominal

23   pain), December 4 (abdominal pain), December 9 (chronic abdominal pain), December 18

24   (back injury), and January 8 (back injury and chronic abdominal pain).  *See supra* at 3-9.

25   At each of these encounters, Plaintiff was evaluated and treated for his complaint of

26   abdominal pain and provided with various types of pain management medications for his

27   pain, including: tramadol (for a month from June 24 to July 23), ibuprofen, Tylenol,

28                                              19

Motrin, acetaminophen 325 mg, ibuprofen 600 mg, amitriptyline 25 mg, acetaminophen 650 mg, and Prilosec 20 mg. *Id.* As Defendant asserts, at least six different physicians and multiple nurses saw, evaluated, and treated Plaintiff for his chronic abdominal pain complaints. *Id.* Furthermore, Plaintiffs tramadol prescription was not automatically discontinued upon his arrival at SQSP on June 24, 2014, but rather continued for a month until July 23, 2014, to treat his chronic abdominal complaints. *Id.* at 3-4. Plaintiff was ultimately tapered off tramadol because every physician at SQSP who assessed, evaluated and treated Plaintiff did not find that tramadol was the appropriate medication to treat his chronic abdominal pain complaints. *Id.* at 4-10. Specifically, the six physicians who assessed and evaluated Plaintiff at different times prescribed him other types of formulary medications. *Id.* As such, there is no evidence that any of these physicians ignored Plaintiff's complaints of chronic abdominal pain, particularly where he exhibited no acute distress nor had any other symptoms such as nausea, vomiting, constipation, or diarrhea. *Id.* Even if they should have been aware of the risk but were not, then they have not violated the Eighth Amendment, no matter how severe the risk. *See Gibson*, 290 F.3d at 1188. Here, there is no evidence that any of the treating physicians, or Defendant Deal for that matter, was ever actually aware of any severe risk to Plaintiff due to his lack of tramadol medication and that they failed to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837.

Furthermore, the evidence shows that Plaintiff refused alternative treatment options several times: June 30, 2014, he refused laboratory tests, *see supra* at 4; on August 1, 2014, he refused Elavil a few days after his tramadol prescription was discontinued, *id.* at 5; in October 2014, he refused for three consecutive days to take amitriptyline 25 mg that was prescribed to treat his chronic abdominal pain, *id.* at 7. In opposition, Plaintiff asserts that he refused laboratory tests because he mistakenly believed it was for his hepatitis C, and that he refused Elavil because he had experienced serious side effects to it in the past. (McCurdy Decl. ¶ 21.) Even if the Court assumes these assertions are true, Plaintiff still

offers no explanation as to why he refused to take the amitriptyline medication prescribed by Dr. Leighton. *See supra* at 7-8. Because Plaintiff refused at least one alternative treatment option, it cannot be said that he suffered undue pain solely because of SQSP medical staff's deficient medical care. Lastly, Plaintiff's assertion that Defendant and other medical staff discriminated against him because of his drug history, even if true, is not enough to establish that they acted with deliberate indifference, particularly since it is undisputed that he was prescribed alternative medications to treat his ongoing pain.

Based on these undisputed facts, Plaintiff has failed to show that SQSP medical staff's chosen course of treatment was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to Plaintiff's health. *Toguchi*, 391 F.3d at 1058. Lastly, Plaintiff's preference for tramadol over other medications that were prescribed for him is merely a difference in medical opinion between a prisoner and prison medical authorities which is insufficient to give rise to a § 1983 claim. *See Franklin*, 662 F.2d at 1344. Accordingly, Defendant Deal is entitled to summary judgment on this claim. *See Celotex Corp.*, 477 U.S. at 323-24.

### 3. Mental Health Needs

Plaintiff also made several allegations regarding his mental health needs, including the claim that SQSP mental health staff wanted to "keep" him as a mental health inmate, and force him to take psychotropic medication. (Am. Compl. at 7.) Defendant asserts that he did not demonstrate deliberate indifference to Plaintiff with respect to his mental health needs. (Mot. at 14, 17.)

The evidence presented does not show a genuine dispute as to any material fact relating to Plaintiff's claim of deliberate indifference against Defendant Deal with respect to his mental health needs. During his less than six-months incarceration at SQSP, Plaintiff was seen and treated by SQSP's mental health staff over thirty times. *See supra* at 10-13; (Desta Decl., Ex. A). He was seen and treated by at least four different staff psychiatrists, multiple clinicians, and the IDTT. *Id.* Defendant Deal had only two medical

21

1    encounters with Plaintiff: first on Plaintiff's arrival at SQSP on June 24, 2014 through a

2    Psychiatrist on Call consultation, and second in a face-to-face meeting on September 30,

3    2014. *Id.* at 10, 12-13. When he arrived at SQSP, on June 24, 2014, Plaintiff had a

4    prescription from a previous provider at a county jail for Neurontin (gabapentin), to help

5    manage his stress and sleep. *Id.* at 10. However, Defendant Deal determined during the

6    Psychiatrist on Call consultation that gabapentin was not psychiatrically indicated, and

7    therefore ordered a gradual, two-step taper over two weeks. *Id.* Two days later, another

8    staff psychiatrist agreed with Defendant Deal's initial assessment to taper Plaintiff off

9    gabapentin after another evaluation and assessment of Plaintiff. *Id.* A little over a week

10   later, Plaintiff met with another SQSP staff psychiatrist who noted that Plaintiff had no

11   clinical indication for further psychotropic medication and that Plaintiff also stated that he

12   had no active symptoms to treat; both doctor and patient agreed to continue with the

13   gabapentin taper. *Id.* at 10. On August 21, 2014, Plaintiff met with another SQSP

14   psychiatrist who determined that no medication was indicated after an evaluation and

15   assessment. *Id.* at 12. Then on the September 30, 2014 face-to-face encounter with

16   Defendant Deal, Plaintiff stated that he wanted to be removed from the mental health

17   services program. *Id.* at 12. Defendant Deal evaluated Plaintiff and noted that he was

18   psychiatrically stable for outpatient level of care, and that there was no evidence of self-

19   harm or violence. His mood was overall stable, and he was actively participating in

20   treatment. *Id.* at 12-13. Accordingly, Defendant Deal planned to continue Plaintiff off

21   psychotropic medications, follow-up as needed with psychiatrist, and to remove Plaintiff

22   from the mental health program as requested. *Id.* at 13. This undisputed evidence shows

23   that Defendant Deal did not act with deliberate indifference with respect to Plaintiff's

24   mental health needs during the two encounters. Nor is there any support for Plaintiff's

25   allegation that mental health staff wanted to "keep" him as a mental health inmate and that

26   they forced him to take psychotropic medication.

27        In opposition, Plaintiff asserts that the gabapentin had helped him in the past and

28                                              22

that even after he was transferred from SQSP to another facility, the mental health officials there prescribed the same medication to treat his pain and mental health issues. (McCurdy Decl. 22.) Plaintiff claims that after he was tapered off gabapentin, he experienced serious mental health issues. (*Id.*) However, there is no indication of any serious mental health issues in his medical records. Rather, during his numerous clinic visits, Plaintiff reported that he was doing okay and had no problems. *See supra* at 12. Furthermore, as with his claim involving his tramadol prescription, this claim regarding gabapentin medication is essentially a "chosen course of treatment" claim: that medical staff chose to taper him off gabapentin versus the alternative course of treatment of continuing it. However, in order to prevail on such a claim, Plaintiff must show that the course of treatment that Defendant and other SQSP mental health staff chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to Plaintiff's health. *Toguchi*, 391 F.3d at 1058. As discussed above, all the SQSP psychiatrists who evaluated and assessed Plaintiff, including Defendant Deal, found that gabapentin was not psychiatrically indicated, and agreed that tapering Plaintiff off it was appropriate. *See supra* at 21. Furthermore, Plaintiff appeared to be doing well without any psychotropic medication, which could only indicate to staff that Plaintiff's mental health had improved. *Id.* Based on this undisputed evidence, Plaintiff has failed to establish that Defendant Deal, or any other SQSP mental health staff, chose a course of treatment that was medically unacceptable under the circumstances and with a conscious disregard of an excessive risk to Plaintiff's mental health. Accordingly, Defendant Deal is entitled to summary judgment on this claim. *See Celotex Corp.*, 477 U.S. at 323.

After reviewing Plaintiff's history of medical and mental health treatment while at SQPS, the Court finds that the evidence presented does not show a genuine dispute as to any material fact relating to Plaintiff's claim of deliberate indifference against Defendant Deal. Assuming that Plaintiff's medical condition constitutes "serious" medical needs, *see McGuckin*, 974 F.2d at 1059-60, Plaintiff has failed to show that Defendant responded

1    with deliberate indifference because there is no evidence that Defendant knowingly

2    disregarded a substantial risk of serious harm to Plaintiff in his manner of treatment.  *See*

3    *Farmer*, 511 U.S. at 837.  Plaintiff has failed to point to specific facts showing that there is

4    a genuine issue for trial, *see Celotex*, 477 U.S. at 324, or identify with reasonable

5    particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279.

6    Accordingly, Defendant is entitled to judgment as a matter of law.  *Id*.; *Celotex Corp*., 477

7    U.S. at 323.

8

9                                    **CONCLUSION**

10          For the reasons stated above, Defendant B. Deal's motion for summary judgment,

11   (Docket No. 118), is **GRANTED**.[5]  The Eighth Amendment deliberate indifference claim

12   against him is **DISMISSED** with prejudice.

13          This order terminates Docket No. 118.

14          **IT IS SO ORDERED.**

15   **Dated:  _September 11, 2019__**

                                          BETH LABSON FREEMAN
16                                        United States District Judge

17

18

19

20

21

22

23

24   Order Granting MSJ
     PRO-SE\BLF\CR.17\01043McCurdy_grant-msj
25

26   _____
     [5] Because the Court finds that no constitutional violation occurred, it is not necessary to
27   reach Defendant's qualified immunity argument.

28                                        24